```
                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                         CHARLOTTE DIVISION

UNITED STATES OF AMERICA      )    DOCKET NO. 3:21-CR-34-2
                              )
          vs.                 )
                              )
JALEN JUWAN JACKSON,          )
                              )
               Defendant.     )
_____)


                 TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE KENNETH D. BELL
             UNITED STATES DISTRICT COURT JUDGE
                      SEPTEMBER 14, 2022




APPEARANCES:

On Behalf of the Government:

     ERIK LINDAHL, ESQ.
     United States Attorney's Office
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

On Behalf of the Defendant:

     JOHN PARKE DAVIS, ESQ.
     Federal Public Defender's Office
     129 West Trade Street, Suite 300
     Charlotte, North Carolina 28202




               Cheryl A. Nuccio, RMR-CRR
                 Official Court Reporter
               United States District Court
                 Charlotte, North Carolina
```

1          P R O C E E D I N G S

2          THE COURT:  The next matter is United States versus

3     Jalen Jackson, docket number 3:21-cr-34.

4          Mr. Jackson, you pled guilty before a magistrate

5     judge on June 17, 2021, at a plea and Rule 11 hearing in which

6     you answered questions under oath; and based on your answers,

7     the magistrate judge found that your plea was knowingly and

8     voluntarily made and he accepted your plea.  No objections

9     were filed to the findings of the magistrate judge and this

10    Court will adopt them as its own.

11         Do the parties stipulate that there is a factual

12    basis for the plea and that the Court may rely on the offense

13    conduct set forth in the presentence report to establish the

14    factual basis?

15         MR. DAVIS:  We do, Your Honor.

16         MR. LINDAHL:  Yes, Your Honor.

17         THE COURT:  Based on that stipulation, the offense

18    conduct set forth in the presentence report, the defendant's

19    plea of guilty before the magistrate judge, and the

20    defendant's admissions, the Court finds that there is a

21    factual basis for the plea.

22         Mr. Jackson, your case was referred to the U.S.

23    Probation Office for preparation of a presentence

24    investigation and report, which the Court has received and

25    reviewed.  Have you read that report?

1      THE DEFENDANT:  Yes.

2      THE COURT:  Do you understand what's in it?

3      THE DEFENDANT:  Yes.

4      THE COURT:  Have you had all the time you would like

5  to discuss it with your attorney?

6      THE DEFENDANT:  Yes.

7      THE COURT:  All right.  Thank you.  You may sit

8  down.

9          Mr. Davis, I see several objections to the report.

10         MR. DAVIS:  Yes, Your Honor.  I think similar to the

11 last hearing, we would be withdrawing the trafficking

12 objection but maintaining the objection to the four-level

13 in-connection-with, which the government is in accord with

14 that.  Separately we'll also withdraw the objections to the

15 conditions of supervision which I believe are outdated at this

16 point.

17         THE COURT:  All right.

18         MR. DAVIS:  I do think it is appropriate, and I'm

19 open to the argument that perhaps this isn't the point in the

20 proceeding to go into it but it is connected, to discuss the

21 reliability of information that is in the presentence report,

22 particularly in regard to a pending case and a dismissed case.

23 I think there are serious issues with the reliability of that

24 information and particularly the way that it was included in

25 this particular PSR.

1          THE COURT:  Do you want to challenge that now or

2     just as part of your argument with respect to the 3553(a)

3     factors?

4          MR. DAVIS:  Your Honor, I do think the inclusion of

5     it in the PSR is problematic; however, I'm not asking for it

6     to be explicitly stricken, so I'm open to including that in

7     the later argument if that's cleaner for the Court.

8          THE COURT:  All right.  Let's handle it that way if

9     you're not seeking to have it changed in the presentence

10    report.

11         So with those withdrawals and stipulations, it

12    appears that before consideration of departure or variance,

13    the guidelines provide for an offense level of 27, a criminal

14    history category I, and an advisory range of 70 to 87 months.

15         Do the parties concur with that?

16         MR. DAVIS:  We do, Your Honor.

17         MR. LINDAHL:  Yes, Your Honor.

18         THE COURT:  All right.  Then, Mr. Davis, I'd be glad

19    to hear from you.

20         MR. DAVIS:  Thank you, Your Honor.

21         As the Court can see, Mr. Jackson has a very low

22    criminal history, criminal record at this point and a

23    difficult background of neglect.  He was homeless and on the

24    streets at a very young age.  His father was largely absent

25    from his life in the early parts of his life, perhaps to his

benefit, frankly, but it was still difficult.  When his mother
entered a homeless shelter, he was, I believe, 13, 12 or 13.
He was too old to be allowed into the women's shelter and so
as a boy, essentially, was forced to live on the street for a
while.  It has not been an easy growing up for him, and yet he
has still maintained a low criminal record up until these
recent events.

Based on all of that -- and I'm going to jump to an
elephant in the room here.  Based on all of that, my intention
originally was to come into this Court and argue for a
downward variance.  This time last week Mr. Lindahl, who
himself had just received it, provided us with documents from
the Mecklenburg County jail about incidents that occurred
there which he has since filed with this Court.  There is --
I'm sure that we could have a lot of back and forth about
individual incidents, but I think the bottom line here is
those are serious.  And as a general proposition, though there
are certainly details he would very much quibble with, as a
general proposition, Mr. Jackson acknowledges that his
behavior there was, to say the least, less than ideal.  I do,
however, want to raise some things from that point.

The Court likely noted that that time frame ended at
the end of March of this year as far as the incident report
came in and that, I think -- I believe it indicates on the
document itself, I may be wrong about that, but that is

1   essentially the time where that document was created.  So that

2   doesn't capture anything that happened after that point.

3           My office -- after speaking with Mr. Jackson, my

4   office independently contacted the Mecklenburg County jail

5   regarding anything after March 28, and I have obtained a copy

6   of the incident reports from March 28 on that I'd like to hand

7   up if I may.  And I'll mark this as Defendant's Exhibit 1

8   which I have previously shown the government.  And to minimize

9   the back and forth, I also have a character letter.  I'll just

10  hand these up together.

11          (Documents tendered to the Court.)

12          (Court peruses documents.)

13          THE COURT:  All right.

14          MR. DAVIS:  Your Honor, I will note -- first of all,

15  I'll note, as the Court has just read, that from March until

16  the present, the only incidents -- quote, unquote, incidents

17  he's involved in is one where -- which basically just notes

18  that he's gone off a fast and the other one where he is merely

19  mentioned in what is an incident report for someone else that

20  has no misconduct of his.

21          From approximately June 15 until August 9 he was

22  transferred to the Irwin County Detention Center.  My office

23  contacted Irwin County Detention Center.  They confirmed this

24  morning that he had no disciplinary incidents down there.

25          We were also able to talk to a DART sergeant, which

1  I'm going to forget what that acronym stands for, but it's in

2  the write-up somewhere, but DART Sergeant Patella.  We were

3  not able to -- we were only able to talk to Sergeant Patella

4  yesterday due to time constraints and the fact that they

5  needed to -- anything in writing has to go through their legal

6  department.  We were not able to get a letter, but I do have a

7  summary of that conversation which I've already given to

8  Mr. Lindahl and he does not object to me reading to the Court.

9  I will note this is a summary of my investigator's

10 conversation with Sergeant Patella.

11         Jalen has a behavioral history of assaults against

12 residents and staff.  Patella says when Jalen first came in,

13 he had a rocky start.  He was very aggressive and started

14 spiraling downward.  Since the last major incident he had, he

15 has been able to speak to Jalen and he began to see a change

16 in him.  He decided to put Jalen on a restrictive housing

17 program that is actually not up and running yet; however, they

18 currently have one inmate doing some of the programming and it

19 has been recommended that Jalen be in the next enrollment.

20 The housing department had a meeting about the program

21 today -- that being yesterday.  The housing program teaches

22 life skills, mindset changes, keeps inmates -- excuse me,

23 inmate activity involved, helps them understand their

24 situation, psychological assistance, behavioral modification,

25 as well as medication management.  Although Jalen isn't

officially in the program, these are the things that have been
used to help Jalen and he has done a great job in adjusting.
His behavior has changed drastically.  Jalen has fallen back
into flying under the radar.  Patella says now they are able
to talk to Jalen and deescalate situations and calm him down.
Jalen is focusing on getting himself together and not as
aggressive anymore.

I bring all of that up because I think it casts a
more complete picture of where he is now and I think it also
casts light on his prospects for future rehabilitation.
Mr. Jackson is not someone who's done time before.  He's not
someone who -- his priors are, I believe, trespassing and a
simple assault.  He does have serious pending charge, and I
will get into that in a moment.  But I think the positive side
here is though he went into jail not taking this situation
seriously, still acting like a fool, to say the least, and I
understand that is a minor way of characterizing his conduct,
he has now gotten it.

I don't know that it ties to this, but I will
note -- and I won't go into the content, but I did have a
conversation with him right around that time when he was in
the hole and I hope that that may have contributed some to
this.  My regret -- and I'm not blaming anyone for it.  I'm
just saying my regret here is that I wasn't notified that this
was going on in there earlier and maybe I could have had that

conversation sooner. But I think it's notable not just that he behaved himself in the Mecklenburg County jail but also in the Irwin County Detention Center, and also we have -- one of the people who's in the unit that he had previously been the most aggressive with who is genuinely saying he sees this person actually changing their behavior. I think this shows that even though we had a bad start, ultimately the process can work. Ultimately rehabilitation is available to Mr. Jackson. It took longer than it should have for him to get there, but he got there.

THE COURT: Are these issues akin to any mental health concerns? And I ask that just as to whether the Court should recommend mental health treatment or even while on supervised release provide mental health assistance, or is it really just a matter of maturity and controlling yourself?

MR. DAVIS: I think it's largely maturity. I guess where I'm struggling is I think he could use anger management, and it seems like he's already gotten some of that and that has helped. That's a large -- some of that is what has really helped him so far. I'm not sure if that's appropriately characterized as mental health treatment, but I do think that would be appropriate and a positive thing for him, particularly given that he seems to be amenable to it and he seems to take well to it.

I think that may segue well to the other aspect of

1  this, which is what I referred to earlier, the information in

2  the presentence report regarding his dismissed and pending

3  charges.  The dismissed charges, there is, I think it's safe

4  to say, an inherently unreliable description in court papers

5  about charges that he was not convicted of.  I know the Guide

6  to Judiciary Policy acknowledges that as well when it advises

7  PSR writers that since there is no reliable information about

8  the facts, that those should only be noted to the Court to

9  note previous encounters with law enforcement in that regard.

10  I don't think -- that's probably not terribly controversial to

11  say, you know, that things he didn't get convicted of the

12  Court shouldn't consider him to have done.  I think that's

13  probably pretty straightforward.

14          I think the bigger -- the larger issue is, of

15  course, the pending state charges which are very, very

16  serious.  The main thing that I have to take issue with in

17  regard to the PSR, because I think it's obviously appropriate

18  for the Court to be aware of what those charges are and what

19  the allegations are, but the main issue I take with it is

20  essentially the statements in the PSR that say that this was

21  true, that say law enforcement did this, law enforcement did

22  establish that he was involved.  A better way of stating all

23  of this and an accurate way of stating this would be according

24  to the indictment or it is alleged that, because he vehemently

25  denies any involvement in that.

1          In the previous hearing the Court alluded to some of
2    the facts here, and I'll repeat them for this record.  The
3    pending charges against Mr. Jackson come -- I have information
4    about one of them.  I don't really have much about the other,
5    but they are related.  A shooting incident where the victim of
6    the shooting stated that he believed that the shooting
7    incident came from disputes and disagreements that he had with
8    Walter Jackson, Mr. Jackson's father.  That he was one million
9    percent sure that Walter Jackson drove the car involved in the
10   shooting and that he was 70 percent sure that his son was with
11   him.  And I believe in a later statement he characterized that
12   as unsure that his son was with him.
13          THE COURT:  That's the way I recall the reports as
14   well.
15          MR. DAVIS:  I think it's fair to say that 70 percent
16   sure is not beyond a reasonable doubt.  And I don't mean to
17   say that this is the entire case.  A large part of the point I
18   want to make is we shouldn't be having mini trials about these
19   things in federal court and it puts us in a very difficult
20   position when we have to address severely prejudicial facts
21   like that without, you know, trying to have a mini trial on
22   something that the government and the defense agree is not
23   actually relevant conduct to this case.
24          And the reason I want to bring it up is because I
25   wanted to, to some extent, unring the bell of the insinuation

1   that he's definitely guilty of this because I think that that

2   is written into the PSR.  Mr. Jackson does intend to contest

3   those charges.  I will relay to the Court that the state -- I

4   haven't talked to Mr. Lindahl because there's no point in it.

5   The state court did, through his state counsel, suggest that

6   he could agree to more time in this case and they might drop

7   those cases and he has refused that, so that's why I haven't

8   even aired that to Mr. Lindahl.

9           And we believe that the facts will show -- I'd note

10  for the Court -- refer the Court to the employment section of

11  the PSR, which I believe is paragraph 80, that notes that from

12  July of 2020 until his arrest -- I'm sorry, that's not the

13  appropriate paragraph.

14          THE COURT:  It is 80.  It refers to his employment.

15          MR. DAVIS:  Oh, yes, you're correct, Your Honor.

16  But it is actually 71 that has the information I'm referring

17  to which notes that he resided in Wilkesboro, North Carolina,

18  from July 2020 until his arrest.  I was confused there because

19  he was in Wilkesboro for work which is why I made that

20  mistake.  These events happened in August and September of

21  2020.  We believe -- it's my understanding, I should say.

22  It's not my case and my knowledge of the facts is high level.

23  But my understanding is it is their belief that they will be

24  able to establish that he was not present at the time of

25  this -- that these events occurred.

1          THE COURT:  Well, I think the way that I'll handle
2  this, I will not consider the dismissed conduct and neither
3  will I consider the pending charges.  My way to address that
4  will be just the sentence imposed in this case will be ordered
5  to run consecutive to any other sentence.  So if the state
6  court resolves it to justice's satisfaction that he committed
7  those offenses, then he'll be separately punished for that,
8  but he won't be punished for that in this case.
9          MR. DAVIS:  I think that's a fair resolution, Your
10 Honor.
11         And the final -- well, second to final thing that
12 I'd like to discuss is the influence of his father in regards
13 to this case.  And I expect there's -- I'm sure his father
14 would not agree, but I think the criminal records speak for
15 themselves.  Walter Jackson has a lengthy criminal record of
16 assaultive behavior.  Jalen Jackson has a trespass and a
17 simple assault and is a criminal history category I.  I think
18 that in many ways speaks for itself.  This is someone who did
19 not have his father in his life for most of his life.  And
20 then his father is the one who initially sets up these deals,
21 who is present for all of them, who makes sure that he, as a
22 felon, is not the one handling the firearms himself, that it
23 is Jalen Jackson.
24         And I'm not minimizing Jalen's involvement.  He was
25 obviously a part of this and full in, and he certainly, you

1   know, texted with agents himself.  I don't mean that in any

2   way to imply that he was not a full part of these

3   transactions.  He was.

4           But I think —— it is certainly difficult to say that

5   he would —— that this person, this criminal history category I

6   person would have been here doing these things if he didn't

7   have this father figure with his violent bad criminal record

8   coming back into his life and strongly influencing him.  That

9   relationship has deteriorated, it's fair to say.  I don't

10  think that that is a risk in the future.

11          Under all of the circumstances —— oh, the final

12  thing I do want to note is he would request placement in a BOP

13  facility —— he has reached out to me about programs that he is

14  interested in that have training in automotive technology and

15  he's also interested in a CDL —— as close to Charlotte as

16  possible.  I know Butner has those programs, but I would just

17  say as close to Charlotte as possible.

18          THE COURT:  I think I just recommended that his

19  father be incarcerated at Butner, so we don't want to do that.

20      MR. DAVIS:  Maybe just as close as possible with

21  those programs.

22          THE COURT:  Yeah, I wish we had done this in

23  different order because I know Butner does have an automotive

24  program and a CDL, but all right.

25          MR. DAVIS:  And I just want to note that he did ——

you know, he unilaterally reached out to me to ask about it and to research it himself. We try to talk about it, but he was the one who initiated all of that conversation, which I think is a very good sign for where he is headed in the future.

So like I said at the beginning of this, I came in here wanting to ask for a downward variance. I still think this is a very substantial sentence. I don't know -- I have to acknowledge that the things in the Mecklenburg County jail did happen and even though it does seem that he's come a long way since then, they did happen, that's real, and I'm not sure that it's appropriate for me to ask for a variance in light of that. I would still ask the Court in consideration of all the circumstances to consider something at the low end of the guidelines.

THE COURT: Let me ask about this. Obviously he didn't -- he's under no legal obligation to assist the government, but he didn't. Is there some reason for that? I mean, the Court would prefer if it was in a position to reward cooperation, but obviously it's not. And then if you want to tie that in, is there any concern about perhaps the lack of complete acceptance of responsibility because he entered a straight-up plea without a plea agreement to two counts but not five others? Is that a failure to accept responsibility for that other conduct?

1      MR. DAVIS:  No, Your Honor.  I think actually

2  originally -- I think that was actually basically between

3  Mr. Lindahl and I.  There was a plea offer that was -- I don't

4  know how much we want to go into this.

5      MR. LINDAHL:  I can answer that quickly, Your Honor.

6      THE COURT:  I can kind of guess.

7      MR. LINDAHL:  It had no impact on Mr. Jackson's

8  acceptance.  We just decided that two counts perhaps

9  simplified the process and that was the straight-up plea.

10     THE COURT:  I can pretty well guess how that

11  conversation went, so...

12     MR. DAVIS:  I mean, the only thing that I will

13  offer, and I will -- without -- I guess I will observe this

14  from outside of the attorney/client relationship rather than

15  speaking from inside of it.  Clearly in this case the

16  co-defendant is his father and I think that is probably the

17  best insight that I can express to the Court in that regard.

18     THE COURT:  All right.  Thank you.

19     Mr. Jackson, you have the right to address the Court

20  if you would like to, but you don't have to say anything.

21     THE DEFENDANT:  Oh, yeah, this will be the last time

22  you see me, Your Honor.  That's all I really wanted to say.

23     THE COURT:  All right.  Thank you.

24     Mr. Lindahl.

25     MR. LINDAHL:  Thank you, Your Honor.

1    Your Honor, the government is asking for a sentence
2  of 84 months in this case, 7 years. I believe that's the
3  appropriate term.
4    Your Honor, if I were to assess the culpability of
5  Jalen and Walter Jackson in this case, I would assess it as
6  equal. Mr. Jalen Jackson was often the one wielding the
7  firearms during these transactions. Walter Jackson was the
8  one who originally connected with the confidential informant
9  that got the ball rolling. I do believe that they are equally
10 culpable for the sales that occurred.
11   Of course, the major distinction between the two
12 would be criminal history. Mr. Jalen Jackson is a very young
13 man. He comes before the Court with essentially a very
14 minimal history. And Your Honor does have information,
15 though, that can go toward his history and characteristics.
16 That information does include what's set forth at paragraph
17 64, but I understand the Court's position on that.
18   I will say because of the overlap in our two
19 hearings, with the Court's permission, I would go ahead and
20 tender Government's 1 for this hearing to complete the record
21 as well. And I can file that independently after the hearing
22 since Your Honor reviewed it in the other case.
23   MR. DAVIS: No objection.
24   THE COURT: All right.
25   (Government's Exhibit Number 1 was received into

1    evidence.)

2            MR. LINDAHL:  Thank you, Your Honor.

3            And I'd also obviously bring up the sentencing

4    memorandum that was filed by the government in this case that

5    reflects very troubling conduct.  I'm sure it is infrequent,

6    if not the first time, that Your Honor has ever experienced a

7    scenario where a defendant is ordered detained and commits a

8    felony offense or allegedly commits a felony offense in the

9    state of North Carolina during that detention.  It's extremely

10   troubling conduct that I believe bears directly on the

11   characteristics of the defendant and, in large measure,

12   suggests that he poses a risk to the public when he's

13   released.  This kind of behavior suggests as much.  It's

14   erratic, it's violent, it's threatening, and it shows very low

15   regard for other individuals that he's encountering.  So I

16   believe it bears a significant relevance on Your Honor's

17   ultimate decision today.

18           The offense, I've spoken about it already in our

19   earlier hearing.  I'll just reiterate.  Sawed off shotguns

20   that are easier to conceal.  Obliterated serial numbers that

21   by this defendant's own admission make them less traceable.

22   Magazines, extended magazine, one drum magazine that was

23   capable of holding 101 rounds.  This is extremely serious

24   conduct and quite an offense -- if it were one of the first

25   Mr. Jalen Jackson were to commit, quite an offense, quite

1  troubling offense conduct to commit with such a limited
2  history and at such a young age.
3          So, Your Honor, we are asking that the Court
4  consider all of that in fashioning an appropriate sentence.
5  And again, would submit that 84 months, toward the high end of
6  the range but not the high end, would be the appropriate
7  sentence in this case.
8          Thank you.
9          THE COURT:  Well, much to think about here, as there
10 is in most cases really.
11         When the Court considers the seriousness of the
12 offense, and I think I've said this in prior gun trafficking
13 cases, this is an incredibly serious offense.  I mean, this
14 country is drowning in blood right now with shootings and
15 indiscriminate violence that's taking place, and nearly all of
16 it is with guns that are illegally acquired.  And the types of
17 weapons, as Mr. Lindahl described, are particularly
18 concerning:  Sawed off shotguns, obliterated serial numbers,
19 which the only reason for that is so that when they're seized
20 in connection with a crime, nobody can trace it back.  That is
21 conduct worthy of serious imprisonment.
22         The need to deter is sort of a two-way street here.
23 The Court wants the sentence to deter others, obviously.  And
24 I wish that the word would get out that drug -- I mean, excuse
25 me, gun trafficking is not going to be profitable and will be

1  severely punished.

2          But I want to deter you as well, Mr. Jackson.  I

3  heard what you said, I'll be the last judge you will ever see,

4  and I hope that's true.  You are a young man.  And given how

5  tough your childhood was, to get to this point without a

6  serious criminal record is unusual and to your credit.  You're

7  going to get a significant sentence here and I hope that's

8  enough to persuade you that that's not how you want to spend

9  the rest of your life.  You're going to be whatever it is,

10  maybe 30 years old or early 30s, when this is over; and that's

11  a young man, but a man that needs to take care of himself

12  after that.

13          I am concerned about the need to protect the public

14  from you, frankly.  I hear what your lawyer said about the

15  explanations and improvement of your time in jail, but that

16  doesn't give me much confidence that the community is safe

17  from you when you're out in the community.  I'm glad that it's

18  improved.  That's encouraging.  We're going to try to get you

19  some anger management help while you're in custody and while

20  you're on supervised release.  And hopefully the difference

21  between being 24 and 30 will make a difference.  They say it

22  does.  But the sentence needs to protect the public from you,

23  at least for a good little while.

24          I do believe that the Court needs to pay a little

25  bit of attention to avoiding unwarranted sentence disparities

1  here.  I wish that I had a little more flexibility on your

2  sentencing with a motion from the government because of your

3  assistance.  I understand that I guess you didn't want to

4  assist against your father, although there was this other

5  person you could have easily assisted against.  Your father

6  didn't have any hesitancy in cooperating.  And his criminal

7  history is so much worse than yours and I believe that your

8  offense conduct here is the same as his.  But my guess is that

9  you would not have been involved in this but for him.  And his

10 sentence this morning was -- make sure I get this right -- was

11 90 months.  And as I say, his criminal history is so much

12 worse than yours.  I need to keep you significantly under that

13 because of that, but then still do all the other things that

14 I'm suggesting.

15         All right.  So pursuant to the Sentencing Reform Act

16 of 1984 and *U.S. versus Booker*, it is the order of the Court,

17 having considered all the factors in 3553(a), that the

18 defendant is hereby committed to the custody of the United

19 States Bureau of Prisons to be imprisoned for a term of 72

20 months on count one -- excuse me, 60 months on count one and

21 72 months on count four to be served concurrently.  This

22 sentence is to be served consecutively to any other sentence

23 imposed after this date.

24         The Court recommends that he be incarcerated at a

25 facility as close to Charlotte as possible that offers

1   vocational training in automotive and CDL, but not Butner.

2          The Court recommends that he be allowed to

3   participate in any anger management treatment programs while

4   incarcerated and that he be allowed to participate in any

5   other educational and vocational opportunities while

6   incarcerated.

7          Upon release from imprisonment, defendant shall be

8   placed on supervised release for a term of three years.  This

9   term consists of three years on each of counts one and four to

10  be served concurrently.

11         Within 72 hours of release from the Bureau of

12  Prisons, you are to report in person to the probation office

13  in the district into which you are released.

14         While on supervised release, you shall not commit

15  another federal, state, or local crime, and shall comply with

16  each of the discretionary conditions of supervised release

17  that have been adopted by this Court.  Objections to those

18  conditions have been withdrawn.  The Court has considered the

19  appropriateness of each of them with respect to your case and

20  finds that each of them is necessary and appropriate to serve

21  the goals that are appropriate for supervised release.

22         As a special condition of supervised release, the

23  defendant shall participate in an anger management treatment

24  program and the probation officer shall supervise the

25  participation in that program.

1          It is ordered that defendant pay the United States a
2   special assessment of $200.
3          The Court finds that he does not have the ability to
4   pay a fine and no fine will be imposed.  Are there any
5   forfeiture issues here?
6          MR. LINDAHL:  No, Your Honor.  Just like the last
7   case, disposition has been filed.
8          THE COURT:  Would the Court move to dismiss the
9   remaining counts -- I mean, excuse me --
10         MR. LINDAHL:  Yes, Your Honor, the government would
11  so move.  Thank you.
12         THE COURT:  All right.  The Court will grant that.
13         Mr. Jackson, you can appeal your conviction if you
14  believe that your guilty plea was somehow unlawful or
15  involuntary or if there is some other fundamental defect in
16  these proceedings.  You also have the right to appeal your
17  sentence under certain circumstances, particularly if you
18  believe it's contrary to law.  Any notice of appeal must be
19  filed within 14 days of entry of the Court's judgment.  If
20  you're unable to afford the cost of appeal, if you ask, the
21  clerk of court will prepare and file a notice of appeal on
22  your behalf at no cost to you.
23         I suggest you discuss these rights with your
24  attorney, but do you understand them as I have explained them
25  to you?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  Then this matter is

3   concluded.  Mr. Jackson is remanded to the custody of the

4   marshal.  Good luck to you, sir.

5          MR. DAVIS:  Your Honor, I'm sorry.

6          THE COURT:  Yes.

7          MR. DAVIS:  Before you do conclude, may I suggest

8   one minor modification to the placement recommendation?

9          THE COURT:  Yes.

10         MR. DAVIS:  Since we don't know for sure -- you

11  know, BOP does what BOP does.  May I suggest modifying the not

12  Butner to being not the same facility as his father, so that

13  if they put his father somewhere else, he still would have

14  that available.

15         THE COURT:  Yes, I'll be glad to make that

16  modification.  I never know how much my recommendations carry

17  with the Bureau of Prisons, but I would have no prohibition on

18  this defendant being incarcerated at Butner so long as his

19  father is not there.

20         MR. DAVIS:  Thank you, Your Honor.

21         THE COURT:  All right.  Thank you.

22         Mr. Jackson, I hope no judge ever does see you

23  again.

24         THE DEFENDANT:  I appreciate it, Your Honor.

25         MR. DAVIS:  Thank you, Your Honor.

1    THE COURT:  Thank you, Mr. Davis.

2    (End of proceedings at 10:27 AM.)

3    *****

4  UNITED STATES DISTRICT COURT

5  WESTERN DISTRICT OF NORTH CAROLINA

6  CERTIFICATE OF REPORTER

7

8

9    I, Cheryl A. Nuccio, Federal Official Realtime Court

10  Reporter, in and for the United States District Court for the

11  Western District of North Carolina, do hereby certify that

12  pursuant to Section 753, Title 28, United States Code, that

13  the foregoing is a true and correct transcript of the

14  stenographically reported proceedings held in the

15  above-entitled matter and that the transcript page format is

16  in conformance with the regulations of the Judicial Conference

17  of the United States.

18

19    Dated this 18th day of July 2024.

20

21

22    s/Cheryl A. Nuccio
                                  _____
23                                Cheryl A. Nuccio, RMR-CRR
                                  Official Court Reporter
24

25